**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARC S. KIRSCHNER, as Trustee of the REFCO LITIGATION TRUST, <br><br> Plaintiff, <br><br> v. <br><br> CIHLP LLC, CANTOR FITZGERALD L.P. and CANTOR FITZGERALD SECURITIES, <br><br> Defendants. | C.A. No. 1:15-CV-08189 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Marc S. Kirschner, as Trustee of the Refco Litigation Trust ("**Plaintiff**" or "**the Litigation Trust**") for its complaint, hereby alleges, upon knowledge as to itself and upon information and belief (including the investigation of counsel and review of discovery and publicly available information) as to all other matters, as follows:

**INTRODUCTION**

1.    The Litigation Trust brings this claim for breach of contract seeking rescissory and other damages from defendant CIHLP LLC ("**CIHLLC**") as a result of CIHLLC's breach of the Amended and Restated Limited Partnership Agreement, dated as of January 1, 2002, among CIHLLC, CIHLP II LLC, and Refco Group Ltd. ("**RGL**") ("**Partnership Agreement**," attached as Exhibit A hereto, and expressly incorporated by reference herein).  Pursuant to the Partnership Agreement, RGL invested $8 million in Cantor Index Holdings L.P. ("**CIH**") in return for a 10 percent limited partnership interest.  RGL assigned to the Litigation Trust, and the Litigation Trust owns, the breach of partnership agreement claim asserted herein.  Marc S. Kirschner, as Trustee of the Litigation Trust, is authorized to pursue the claim.  The Litigation Trust also

brings this claim against defendants Cantor Fitzgerald L.P. and Cantor Fitzgerald Securities for aiding and abetting CIHLLC's breach of the Partnership Agreement.

2.      At the time the parties entered into the Partnership Agreement, CIH was in the business of owning, operating, developing and investing in businesses involved in betting and contracts for differences, among other products, and it realized the income and gains derived from those products for the mutual benefit of all of CIH's partners.

3.      At all times relevant hereto, CIH had no operations of its own.  Rather, it owned a number of operating subsidiaries whose financial results CIH reported on a consolidated basis. CIH's key operating subsidiary, by any measure, was Cantor Index Limited ("**CIL**").

4.      For most of CIL's existence, its main business was trading activity, comprised of its contracts for difference ("**CFD**") business and its financial spread betting business.  The businesses provided investors opportunities to gamble on movements in financial indices.  CIL's trading activity earned CIL more than $8,000,000 in revenue in 2010.

5.      CIL's trading activity was CIH's most profitable businesses, standing alone or considering all operations of all of CIH's subsidiaries combined.  Indeed, CIL's operations accounted for nearly 90 percent of the assets and revenue of CIH for each year from 2008 through 2013.

6.      Starting in at least 2010, and unbeknownst to RGL, defendants Cantor Fitzgerald L.P. and Cantor Fitzgerald Securities – the entities that run CIHLLC and CIH – began to pick off CIH's profitable assets and transfer them to affiliates, for zero compensation or, in at least one instance, for the nominal consideration of £1.00.

7.      The last of those transactions occurred on December 19, 2012, when CIHLLC caused CIL's CFD and financial spread betting businesses to be sold to a related party, Cantor

Fitzgerald Europe ("**CFE**"), for the nominal sum of $1.00.  At the time of that transaction, the CFD and financial spread betting businesses comprised substantially all of CIH's businesses and/or assets.

8.      Pursuant to Section 3.03 of the Partnership Agreement, CIHLLC, as CIH's general partner, is required to obtain unanimous consent from all partners, which includes RGL, if substantially all of CIH's businesses or assets are to be sold or transferred.

9.       Disregarding all corporate form, and in breach of the Partnership Agreement, CIHLLC failed to provide RGL with any advance notice that the CFD and financial spread betting businesses, which constituted virtually all of CIH's businesses and/or assets, were going to be sold, so that RGL could exercise its voting and veto power over that transaction.  CIHLLC sold off CIL's trading activity to CFE on December 19, 2012, but, in violation of the Partnership Agreement, failed to obtain the requisite unanimous consent for that sale.

10.      CFE thereafter transferred those CFD and financial spread betting businesses to Solo Capital Partners LLP ("**Solo Capital**") in 2014.  That sale appears to not have been an arms'-length transaction because at least two of CIL's former directors – one of whom had also been a director of CFE – had close business ties to Solo Capital at the time of that transaction.

11.      CIH is now a mere husk, stripped of its businesses as the result of the contractual breach that Plaintiff seeks to remedy through this action.  Plaintiff also charges Cantor Fitzgerald LP and Cantor Fitzgerald Securities with responsibility, as aiders and abettors, of CIHLLC's breach of the Partnership Agreement.

## JURISDICTION, VENUE, AND DEMAND FOR TRIAL BY JURY

12.      This action has been commenced to determine an actual controversy between the Litigation Trust and defendants.

13.    The United States District Court for the Southern District of New York has jurisdiction over this action pursuant to 28 U.S.C. § 1334(b), as this action is related to the Refco Inc. chapter 11 cases described below.

14.    In addition, the Partnership Agreement, § 9.12, provides for consent to jurisdiction and venue in "any court of the State of New York or any federal court sitting in the city of New York, NY."  The chapter 11 cases were filed in the United States Bankruptcy Court for the Southern District of New York, Manhattan division.

15.    Venue for this action in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

16.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Litigation Trust hereby demands a trial by jury as to all matters triable thereby.

## PARTIES

17.    Plaintiff Refco Litigation Trust ("**Plaintiff**" or "**the Litigation Trust**") is a litigation trust established by agreement between Refco Group Ltd., LLC ("**RGL**") (described below) and other parties in the Bankruptcy Proceeding (described below) pursuant to the Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries ("Plan") approved by the U.S. Bankruptcy Court for the Southern District of New York on December 15, 2006, in the chapter 11 bankruptcy case captioned *In re: Refco Inc., et al.*, No. 05-60006 (RDD) ("**Bankruptcy Proceeding**").  *See* Bankruptcy Proceeding Dkt. 4088, 4090.  The Litigation Trust was "created pursuant to, and to effectuate certain provisions of, the Plan."  *Id*.  Certain of RGL's claims, defined as "Contributed Claims" under section 5.7 of the Plan, were contributed to the Litigation Trust, including direct claims for breach of the Partnership Agreement.  Under the Plan, the Litigation Trust is the successor to RGL for the claims in this complaint.

18.     Defendant CIHLP LLC ("**CIHLLC**") is a limited liability company organized under the laws of the State of Delaware, and maintains its principal place of business at 499 Park Avenue, New York, New York 10022.  At all relevant times, CIHLLC was the managing general partner of non-party Cantor Index Holdings L.P. ("**CIH**") and was therefore bound by the Partnership Agreement.  It owns a 1% limited partnership interest in CIH.  CIHLLC is run by Cantor, defined below.

19.     Defendant Cantor Fitzgerald Securities ("**CFS**") is a partnership organized under the laws of the State of Tennessee, and maintains its principal place of business at 499 Park Avenue, New York, New York 10022.  At all relevant times, CFS was the sole member of defendant CIHLLC, which in turn was the managing general partner of CIH.  CFS executed the Partnership Agreement for CIHLLC.  CFS's senior executives run CIH.

20.     Defendant Cantor Fitzgerald L.P. ("**Cantor LP**") is a Delaware limited partnership.  It is the sole member of CIHLP II LLC, one of CIH's limited partners.  CF Group Management, Inc. is the managing general partner of Cantor LP.  Cantor LP through CF Group Management, Inc. executed the Partnership Agreement on behalf of CIHLP II LLC.  Cantor LP is the sole member of CFLP CFS Holdings, LLC, which is the managing general partner of CFLP CFS I Holdings, L.P., which is the managing general partner of CFS.  Cantor LP controls CIH, CFS and CFE.  Through a series of intermediate entities, Cantor LP has managerial power over both CFS and CFE.  Cantor LP senior executives and officers run the day to day business of CFS.  Cantor LP and CFS are referred to together as "**Cantor**".

## RELEVANT NON-PARTIES

21.     Refco Group Ltd., LLC ("**RGL**"), a limited liability company organized under the laws of the State of Delaware, is one of the reorganized Debtors, and has a principal place of business c/o Berkeley Research Group, LLC, 250 Pehle Avenue, Suite 301, Saddle Brook, New

Jersey 07663.  It is a subsidiary of Refco, Inc., a corporation organized under the laws of the State of Delaware, and one of the reorganized debtors in the chapter 11 bankruptcy case captioned *In re: Refco Inc., et al.*, No. 05-60006 (RDD) ("**Bankruptcy Proceeding**").  It was a limited partner of non-party CIH at the time of the wrongs complained of herein, and continues to own a limited partnership interest in CIH.

22.    Non-party CIH ("**CIH**") is a limited partnership organized under the laws of the State of Delaware, and maintains its principal place of business at 135 East 59th Street, New York, New York 10022.  The partnership is governed by the Partnership Agreement, which is incorporated by reference herein.  Ex. A.  CIH's general partner is defendant CIHLLC.  CIH's limited partners are defendant CIHLLC (with a 1% limited partner interest), non-party CIHLP II LLC (with an 89% limited partner interest), and RGL (with a 10% limited partner interest).  CIH's wholly owned subsidiaries are CIL, Cantor Index LLC, and Cantor Fitzgerald Game Holdings, LLC and Hollywood Stock Exchange, LLC.

23.    Non-party Cantor Index Limited ("**CIL**") is a limited liability company organized under the laws of England and Wales, and maintains a registered office at One Churchill Place, Canary Wharf, London, E14 5RD.  CIL is a wholly owned subsidiary of CIH.  At all relevant times herein, certain directors of CIL were also directors of CFE, as well as officers of Cantor.

24.    Non-party Cantor Fitzgerald Europe ("**CFE**"), a wholly owned subsidiary of Cantor LP, is an investment bank organized under the laws of England and Wales and maintains its principal place of business at Cantor Capitol, One Churchill Place, Canary Wharf, London E14 5RD.  At all relevant times herein, certain directors of CFE were also directors of CIL, as well as officers of Cantor.

25.    The following is a schematic of the organizational structure of the Cantor entities including CIH (simplified for illustration purposes):



26.    Non-party Howard W. Lutnick ("**Lutnick**") is the Chairman and CEO of Cantor LP, and he has a limited partnership interest greater than 10% in Cantor LP.  Lutnick is the President and sole stockholder of CF Group Management, Inc., which is the managing general partner of Cantor LP.  Lutnick dominates and controls Cantor LP and its subsidiaries, including CIH and CIHLLC.  He was Chairman of CFS, which is the sole member of CIHLLC, at the time of the alleged wrongs.  Lutnick was a director of CFE and of CIL in 2010 when the decision was made to sell CIL's trading activity businesses to CFE.  He owned at least 10% of Cantor LP at the time that CIL's trading activity was transferred to CFE.  Lutnick executed the Partnership Agreement on behalf of CIHLLC and on behalf of CIHLP II LLC.

27.    Non-party Stephen M. Merkel ("**Merkel**") is an officer of CFS.  He is a director and/or officer of Cantor LP.  Merkel served as a director and officer of CIHLLC at the time of

the alleged wrongs.  Merkel was also a director of both CIL and CFE in 2010 when the decision was made to sell CIL's trading activity businesses to CFE, and in 2012 when CIL's trading activity businesses were transferred to CFE.

28.    Upon information and belief, a number of individuals employed by Cantor LP are current and or former directors of CIL and CFE who served in those capacities in 2010 when the decision was made to sell CIL's trading activity businesses to CFE, and in 2012 when CIL's trading activity businesses were transferred to CFE.  Among them are R. Mark Snelling and Mark A. Cooper.

29.    Non-party Douglas R. Barnard ("**Barnard**") is an officer of Cantor LP, and was a director of CIL and of CFE in 2010 when the decision was made to sell CIL's trading activity businesses to CFE.

30.    Non-party Charles J. Knott ("**Knott**") was a director of both CIL and CFE in 2010 when the decision was made to sell CIL's trading activity businesses to CFE, and in 2012 when CIL's trading activity businesses were transferred to CFE.  Knott continued to serve as a director of CFE at or around the time that CFE sold to Solo Capital the trading activity that it had acquired from CIL.  Knott had close business ties to Solo Capital at the time CFE sold its trading activity to Solo Capital in 2014.  According to Solo Capital's website, Knott was part of the Cantor management team that launched CIL, responsible for the start-up of CIL's CFD business, and in 2008, he became the CEO of CIL and was appointed a board director of CFE.

31.    Non-party Anne C. Stratford-Martin ("**Stratford-Martin**") was a director of both CIL and CFE in 2010 when the decision was made to sell CIL's trading activity businesses to CFE, and in 2012 when CIL's trading activity businesses were transferred to CFE.  Stratford-Martin had control over Solo Capital at the time CFE sold its trading activity to Solo Capital in

2014.  According to Solo Capital's website, Stratford-Martin held the position of Chief Operating Officer and Director of Legal for CIL 2008 to 2013 before joining Solo Capital as Chief Executive Officer in November 2013.

## RELEVANT PROCEDURAL BACKGROUND

32.    RGL is a plaintiff in a lawsuit captioned *Refco Group Ltd., LLC v. Cantor Fitzgerald, L.P.*, No. 13 CIV. 1654 RA (S.D.N.Y.) pending in the District Court ("**Derivative Litigation**").  In that lawsuit, RGL is pursuing derivative claims on behalf of CIH against CIHLLC, CFS and Cantor LP, among other defendants.  The defendants in the Derivative Litigation sought dismissal of the then-operative complaint on the grounds that, *inter alia*, RGL lacked standing to pursue any of the claims asserted in the complaint.

33.    On June 10, 2014, the Court issued an Opinion and Order holding that RGL had standing to assert most of its derivative claims, but also granting the Derivative Litigation defendants' motion to dismiss RGL's breach of Partnership Agreement claim, which is the subject of this lawsuit by the Litigation Trust, because it had been transferred to the Litigation Trust.  *Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*, No. 13 CIV. 1654 RA, 2014 WL 2610608, at *10-11 (S.D.N.Y. June 10, 2014) ( "***Opinion***").  In the Opinion, the Court held that:

> on the effective date of the Plan, all "Contributed Claims" were "transferred to [a] Litigation Trust" established "for pursuit of the Contributed Claims," and "the Debtors" were deemed to "have no interest in or with respect to the Contributed Claims." (Modified Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries ("Plan") ¶¶ 5.7(a)-(b), *In re Refco, Inc., et al.,* Case No. 05–60006, ECF No. 3948.) RGL is a "Debtor" under the Plan. (Plan ¶¶ 1.13, 1.66, Ex. A.) The definition of "Contributed Claims" includes "Litigation Claims." (*Id.* ¶ 1.48.) The Plan defines "Litigation Claims" as "the claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that any Debtor ... may hold against any Person," with certain exceptions that the parties do not argue are applicable here. (*Id* . ¶ 1.132.)

*Opinion*, 2014 WL 2610608, at *11. The Court further held that RGL's breach of partnership agreement claim was a Contributed Claim, *i.e.*, a "claim[ ] ... in law or in equity" held by RGL, (Plan ¶ 1.112), and because that claim was transferred to the Litigation Trust, RGL no longer had standing to pursue it. *Id*. The Court alternatively held that RGL had not properly alleged that CIHLLC sold "substantially all" of the assets held by CIH and its subsidiaries. Having standing, as determined in the Derivative Litigation, the Litigation Trust now alleges that "substantially all" of the assets of CIH were transferred in 2012.

34.    By Order dated July 6, 2015, United States Magistrate Judge Henry Pitman of the United States District Court for the Southern District of New York granted RGL's motion to file a Second Amended Complaint ("**SAC**") in the Derivative Litigation. Among other things, the SAC addresses certain pleading deficiencies discussed in the Opinion. The SAC includes RGL's prior claim against CIHLLC for breach of partnership agreement expressly and solely to preserve the claim for appellate review. The filing of the SAC has been stayed pending a ruling on the appeal of the July 6, 2015 Order filed by the defendants in the Derivative Litigation.

## FACTUAL ALLEGATIONS

**RGL Invests In CIH With Proscribed Limits On CIHLLC's Authority**

35.    In May 2000, Cantor formed CIH to take advantage of Cantor's expertise in financial services in order to enter the gambling business.

36.    In or around the winter of 2001, representatives of Cantor LP and of Refco Inc. had discussions concerning an investment by Refco in CIH.

37.    Those discussions culminated in a transaction on or about January 1, 2002, whereby RGL invested $8 million in CIH in exchange for a 10% limited partnership interest in CIH.

38.    In connection with RGL's $8 million investment, CIHLLC, CIHLP II LLC and RGL executed the Partnership Agreement, which sets forth the relevant rights, powers and responsibilities of the general and limited partners of CIH.

39.    The Partnership Agreement at Section 1.01 provides, *inter alia*, that CIH was created to "own, operate, develop and invest in businesses which are connected with, or involved in, games, gaming, betting, lotteries, contracts for differences, futures, options and financial and commodity products (the 'Products')" and to "realize the income and gains to be derived from the Products, for the mutual benefit of the Partners."

40.    Pursuant to Section 3.01 of the Partnership Agreement, "[e]xcept as provided by the [LP] Act or in this [Partnership] Agreement, the General Partner shall have the sole power to make management decisions on behalf of [CIH] and to exercise the powers set forth in Section 3.02 [of the Partnership Agreement]."

41.    The Partnership Agreement, at Section 3.02, provides, *inter alia*, that CIHLLC has the power to act for the Partnership.

42.    Section 3.03, however, titled "Actions Requiring Unanimous Consent" expressly qualifies the General Partner's powers set forth in Section 3.02.   Section 3.03 specifically provides, in relevant part:

> Notwithstanding any other provision of this Agreement, no action will be taken by the General Partner with respect to or within the scope of any of the decisions or actions specified below in relation to the Partnership unless such decision or action shall have first been approved unanimously by all of the Partners:
> (c) Selling all, or substantially all, of the business or assets of the Partnership or Hollywood Stock Exchange, LLC.

Ex. A, § 3.03.  The term "Partners" is defined in the first paragraph of the Partnership Agreement as CIHLLC, CIHLP II LLC, and RGL.

**CIL's Lucrative Businesses**

43.    Through its subsidiaries and affiliates, Cantor LP developed technology for betting on, among other things, financial markets.

44.    In or around 2000, Cantor began pursuing ventures for betting in the United Kingdom including by forming CIL in May 2000 as a wholly owned subsidiary of CIH.  CIL obtained a bookmaker's permit from the British government and opened a bookmaker's business.  In December 2000, CIL launched an online gaming platform and website for bookmakers.

45.    CIH has disclosed in Note 1 to its consolidated financial statements for each of the years ended December 31, 2003, through December 31, 2013, that CIL is CIH's principal operating subsidiary.  As attested to by Michael Lalo ("Lalo"), Cantor LP's Director of Financial Reporting, in a sworn declaration dated May 27, 2011, a significant portion of the profit and loss and balance sheet for CIH belongs to CIL.  In fact, at an August 14, 2015 hearing in an adversary proceeding in the Bankruptcy Proceedings, captioned *Refco Group Ltd, LLC v. Cantor Index Holdings L.P. et al.*, Adv. No. 10-03527 (RDD), Lalo testified that CIL's operations accounted for nearly 90 percent of the assets and revenue of CIH for each year 2008 through 2012.

46.    In each of CIL's Report and Financial Statements for years ended December 31, 2005, through December 31, 2011, CIL stated that its principal activity is to provide spread betting services to clients and act as a broker in arrangements known as contracts for difference ("**CFDs**").

47.    With spread betting on financial instruments, a bettor predicts whether the price of the financial instrument will rise or fall, without having to physically buy or sell the instrument.  The bettor "stakes" an amount of money that he will win or lose each time the price

of the instrument on which he is betting moves by one "point." A point is the unit of price of the instrument. Depending on the instrument, this could be movements of 1, 0.1 or 10, for example. Spread betting allows the bettor to bet in both directions, since the bettor does not physically have to buy or sell the instrument. The bettor simply speculates on whether he thinks the price of the instrument will rise or fall. If he is right, he moves into profit; and if he is wrong, the bettor incurs losses. In spread betting, the "spread" is the cost to the bettor to open and close the spread bet. The spread is the difference between the price at which the bettor can buy (i.e., the offer price) and the price at which the bettor can sell (i.e., the bid price). The closer these two prices are (i.e., the "tighter" the spread), the less the cost to the bettor. The bettor's winnings and losses are then determined by the number of points difference between the price at which the bettor entered his bet and the price at which the better closed the bet, multiplied by the bettor's stake for the bet. In other words, the bettor wins more the more the price for the instrument moves in the direction predicted, and loses more the more the price for the instrument moves away from the direction predicted. Spread bets are a leveraged product, which means that the bettor can open a proportionally larger position than the capital the bettor has to invest. This also means that the bettor's liabilities can be bigger than his initial stake.

48. Financial Fixed Odds ("FFO") betting is related to CIL's financial spread betting business. With FFO betting, the bettor similarly predicts whether a financial market will finish above or below a specified level at the time the market expires. If the bettor is correct, he wins. If not, he loses. However, with FFO betting, the bettor's risk is limited to the stake the bettor is prepared to bet.

49.    These ventures allow customers to wager on future events, such as the movement of stock prices and indexes, the outcome of sporting events, and even individual plays during sporting events.

50.    CIL's business also involved acting as "an introducing broker" for trading in CFDs.  A CFD is a contract between an investor and an investment bank or a spread betting firm, at the end of which the parties exchange the difference between the opening and closing prices of a specified financial instrument, including shares or commodities.  The CFD is the agreement between two parties – the investor and the CFD provider – to pay each other the change in the price of an underlying asset.  Depending on which way the price moves, one party pays the other the difference from the time the contract was agreed to the point where it ends.  Like spread bets, CFDs involve the investor taking an opposing view to the insurer, speculating that an asset price will rise, by buying ("long" position), or fall, by selling ("short" position).  Because the investor only has to put down a small deposit on trades, or "margin," the investor can make large profits – or losses – on the money committed, from small moves in the price.

51.    CIL's expansion and growth was profitable for CIL, and in turn, for CIH.  In the year prior to November 23, 2001, CIL's spread betting customers doubled.  CIL continued its positive growth and development of its business.

52.    For example, on or about January 30, 2002, CIL became the first spread betting firm to offer round-the-clock trading, which it did through its website.  In September 2003, CIL introduced a key new technology, "Cantor Mobile," the first real-time mobile trading device in the world.  Cantor Mobile, using a handheld PC called an "XDA," gave mobile access to real-time finance and sports news, charting, continuous streaming of live prices and instant trading,

and allowed users of the handheld devices to wager on financial indices and sporting events with spread betting.

53.    The mobile wagering was very successful.  By April 2005, Cantor Mobile represented a significant percentage of all of CIL'S business.

54.    In connection with the growth of spread betting using mobile, handheld devices, in June 2004, CIL launched "Spreadfair," an online spread betting exchange designed to allow for customer to customer betting ("**Spreadfair**").  Spreadfair was the world's first sports spread betting exchange.  CIL made profits on the bets made by customers through Spreadfair.

55.    In August 2005, CIL teamed up with another company, Ladbrokes, to launch another very successful product:  an FFO betting service that allowed clients to bet on a range of financial markets, including how the market would fluctuate during certain intervals (e.g., five minutes).

56.    CIL derived substantial revenues from its business activities.  For the fiscal year ended December 31, 2006, CIL reported revenue of approximately $76.4 million, "net of any related dealing / broking expenses (e.g. commissions cost of carry)."  For the fiscal year ended December 31, 2007, CIL reported revenue of approximately $51.0 million, "net of any related dealing / broking expenses (e.g. commissions cost of carry)."

**Cantor Systematically Sells Off CIH's Businesses Run by CIL**

57.    During 2008, Cantor caused Spreadfair to be discontinued as part of its process of transferring the business to Cantor G&W (Nevada) L.P. ("Cantor Nevada"), a related Cantor entity organized under Nevada law.

58.    Cantor also caused the transfers of CIL's intellectual property to create mobile gaming and its predictive algorithm program called Midas, which were apparently accomplished

without any recorded transaction, in order to enable Cantor's related party, Cantor Nevada, to create a mobile gaming empire in the United States.

59.    Cantor also caused the transfers of CIL's FFO business to Cantor Gaming & Wagering Limited, a related company, on February 1, 2010.  During early 2010, Cantor Entertainment Technology, Inc. ("**CET**"), a Cantor affiliate, acquired, through entities under common control, Cantor Gaming and Wagering Limited (U.K.) ("**CGWL (UK)**"), when it was contributed by Cantor to CET from CIL.

60.    Specifically, Cantor caused CGWL (UK) to file an application for a gambling license with UK authorities in late 2009, which explained that CGWL (UK) would be the successor to CIL's FFO business as part of a purported corporate reorganization and that CGWL (UK) needed a quick decision on its license application so that it could seamlessly take over operations by the time CIL's license expired on January 29, 2010.  A few months later, to paper over this raid on CIL's FFO business, Cantor caused CIL to enter into an asset purchase agreement with CGWL (UK) for only £1.00 for the sale of CIL's FFO business, including all of CIL's intellectual property and employees to CGWL (UK), with a retroactive effective date of midnight on February 1, 2010.

**Defendants Sell off CIL's Remaining, Lucrative Businesses To CFE In December 2012**

61.    As a result of the foregoing transactions, all that remained of CIL's businesses were its lucrative CFD and spread betting businesses.  In its Annual Report and Financial Statements for the years ended December 31, 2010 ("2010 Annual Report") and December 31, 2011 ("2011 Annual Report") filed with the Companies House – the United Kingdom's registrar of companies – CIL stated that its principal activity "is to provide spread betting services to

clients and act as a broker in contracts for difference ("CFDs')," and that its "two main business lines . . . are the CFD and spread betting businesses."

62.    The CFD and financial spread betting businesses not only constituted substantially all of CIL's businesses, but they comprised substantially all of CIH's businesses as well.    As Lalo testified, CIL's operations accounted for nearly 90 percent of the assets and revenue of CIH each year from 2008 through 2012.

63.    Before the CFD and financial spread betting businesses were sold to CFE in December 2012 (without RGL's consent), CIH and CIL derived income solely from that trading activity.    For the year ended 2010, CIL reported revenue of $8,089,000 arising from its trading in CFDs and its spread betting business.    For that same year, CIH reported total revenues of $8,388,000.    For 2011, CIL reported revenues attributable to its CFD and financial spread betting business of $10,334,000; CIH reported total revenues of $10,914,000.    In 2012, CIL reported revenues attributable to its two remaining businesses of $11,203,000; CIH reported total revenues of $11,278,000.

64.    Because the CFD and financial spread betting businesses constituted substantially all of CIH's assets or businesses, Section 3.03 of the Partnership Agreement required unanimous consent of all of CIH's partners before those businesses could be sold.

65.    In violation of the Partnership Agreement, Defendants caused CIL to transfer out the last remaining businesses of CIL without providing any notice to RGL or an opportunity to consent or object to that transaction.

66.    In its 2010 Annual Report, CIL stated that "[f]ollowing a review conducted by the management of the Company to ensure resources are most efficiently deployed within the [Cantor LP] group, the directors have commenced a project to transfer all trading activity of the

Company to Cantor Fitzgerald Europe."  CIL also stated that it would retain an economic interest in the activities transferred.

67.    CIL's directors (among them Lutnick, Merkel, Barnard, Knott and Stratford-Martin) stated in their Directors' Report (included in CIL's 2010 Annual Report), that "Management of the Company has conducted a review of its activities and has commenced a project to transfer all the trading activity of the Company to Cantor Fitzgerald Europe. It is intended that the transfer will be completed by the end of the second quarter of 2011. The Company will retain an economic interest in the trading activity transferred."  CIL similarly disclosed that "[f]ollowing a review conducted by the management of the Company to ensure resources are most efficiently deployed within the CFLP group, the directors have commenced a project to transfer all trading activity of the Company to Cantor Fitzgerald Europe. The Company will retain an economic interest in the activities transferred."

68.    CIL's directors (among them Lutnick, Merkel, Barnard, Knott, and Stratford-Martin) similarly stated in their Directors' Report (included in the 2011 Annual Report) that "[f]ollowing a review conducted by the management of [CIL], the directors have commenced a project to introduce all of the clients of the Company to CFE," and repeated that CIL would retain an economic interest in the trading activity of the clients introduced.

69.    That "project" turned out to be the improper transfer of CIL's financial spread betting and CFD businesses to CFE without RGL's consent, which consent was expressly required by the Partnership Agreement.  On or about December 19, 2012, CIHLLC caused CIL to sell its CFD and financial spread betting businesses to CFE for the sum of $1.  As CIL disclosed it in its Annual Report and Financial Statements for the year ended December 31, 2012 ("**2012 Annual Report**"), "[t]he Board determined in 2012, that to enable the long term

development of the CFD and [financial spread betting] businesses, it would be more beneficial to sell the CFD and FSB businesses to CFE.  The effective date of the sale was 19 December 2012 and CFE acquired the assets and liabilities of the CFD and FSB businesses at fair value plus goodwill of $1.  On the transfer of the businesses from [CIL] to CFE . . . compensation arrangements [between CIL and CFE] ceased."

70.    Contrary to the pronouncements in 2010 and 2011 concerning the transfer of these businesses, CIL ultimately retained no economic interest in the assets sold.  Rather, CIL disclosed in its 2012 Annual Report that it "will remain active, but not trading, while the Directors consider the future strategy of the Company.  In March 2013, the directors agreed to apply to the FCA [UK's Financial Conduct Authority] in order to deauthorise the Company."  In June 2013, CIL was deauthorised by the FCA.

71.    Starting in its the 2012 Annual Report, CIL no longer described its CFD and financial spread betting business as on-going. Since 2012, CIL has classified the CFD and financial spread betting businesses as discontinued operations.  According to its Annual Report and Financial Statements for year ended December 31, 2013, CIL is no longer actively trading, and there is no intention to do so in the future.  For year ended December 31, 2013, CIL reported $0 revenues in 2013; CIH reported a mere $33,000.

72.    Because CIL's trading activity businesses were the most substantial and valuable assets of CIH, CIHLLC were required by Section 3.03 of the Partnership Agreement to obtain RGL's consent to that transfer.

73.    In violation of Section 3.03 of the Partnership Agreement, the transfer of the CFD and spread betting businesses constituted a sale of "substantially all" of the business and assets of the Partnership.  CIHLLC neither sought nor received consent from RGL for this sale.

74.    Because CIH did not obtain consent from RGL for these transfers, its actions have violated Section 3.03 of the Partnership Agreement.

**CFE Flips The Trading Activity To Knott's and Stratford-Martin's Affiliate, Solo Capital**

75.    According to a CIL's webpage, http://www.cantorcapital.com/maintenance, "[o]n November 16th, 2014 the Cantor Capital business of Cantor Fitzgerald Europe was transferred to Solo Capital Partners LLP.  For queries on CFDs or Financial Spread Betting please visit www.solo.com or contact Solo Client Services at cs@solo.com or on +44 (0) 207 382 4941."  The web page did not disclose the sum that Solo Capital paid CFE.

76.    On or about September 9, 2015, Solo Capital issued its Report and Financial Statements for the year ended March 31, 2015, in which it disclosed that on "17 November 2014 the partnership acquired the CFD and Spread Betting business from Cantor Fitzgerald in exchange for £3m cash consideration [approximately $4.6 million at the time])."  Clearly, CFE made a handsome profit selling the CFD and financial spread betting businesses to Solo Capital.  With that 2014 CFE/Solo Capital deal sealed, Solo Capital could now include CFD and spread betting among its principal activities.

77.    Individuals running CIL and CFE have close, if not controlling, business ties to Solo Capital.  At the time of the sale of CIL's CFD and spread betting businesses to CFE, Knott was a director of both CIL and CFE.   According to the Financial Services Register of the United Kingdom's Financial Conduct Authority, Knott continued to serve as a director of CFE until on or about November 16, 2014, which is the date that CFE announced its sale of its trading activity to Solo Capital.   Knott is also listed in the Financial Services Register as having been a "customer" of CFE from November 1, 2007, to November 16, 2014, and a "customer" of CIL from November 1, 2007, to June 24, 2013.  A "customer" has the function of, among other

things, acting as an investment manager and dealing, as principal or as agent, and arranging deals involving investments. Knott is listed in the Financial Services Register as a "customer" of Solo Partners since December 2, 2014, and as having a "significant management" role in Solo Partners since July 2, 2015.

78.    According to records of the UK's Companies House, Stratford-Martin was appointed as LLP Designated Member of Solo Capital on November 25, 2013. The FCA's Financial Services Register lists Stratford-Martin as having been a partner in Solo Capital since January 16, 2014, and identifies her as its Chief Executive. Solo Group (Holdings) Limited was appointed as LLP Designated Member of Solo Capital on February 2, 2015. Stratford-Martin is the director and Chief Executive Officer of Solo Group (Holdings) Limited.

79.    Solo Group Services Limited is also wholly owned by Solo Group (Holdings) Limited. Stratford-Martin has been its director and CEO since on or about October 7, 2014.

80.    Since on or about April 16, 2015, Knott has also been Chief Executive and a Director of Old Park Lane Capital Limited. From on or about October 15, 2014 to until on or about August 25, 2015, Stratford-Martin served as a director of Old Park Lane Capital Limited. Old Park Lane Capital Limited is a wholly owned subsidiary of Solo Group (Holdings) Limited. In note 13 to its financial statements for the year ended March 31, 2015, Solo Capital identified Old Park Lane Limited as one of its related parties. Upon information and belief, Old Park Lane Limited is an affiliate of Old Park Lane Capital Limited.

81.    The Financial Services Register identifies Solo Capital as the trade name of Callisto Advisors. Upon information and belief, Callisto Advisors LLP is the prior company name of Callisto Asset Management LLP. The two current officers of Callisto Asset Management LLP are Solo Group (Holdings) Limited, which was appointed on February 2,

2015, and Stratford-Martin, who was appointed on February 25, 2015.  Since at least June 4, 2015, Stratford-Martin has been a partner in Callisto Asset Management LLP.

82.    Solo Capital, Old Park Lane Capital Limited and Callisto Asset Management LLP list the same principal place of business on the FCA's Financial Services Register.  Solo Capital, Old Park Lane Capital Limited and Callisto Asset Management LLP share overlapping controlling entities.  A number of current or former Solo Capital customers have also been customers of CFE and/or CIL, or Old Park Lane Capital Limited.

## PLAINTIFF'S CLAIMS ARE TIMELY

83.    Defendants hid from Plaintiff and RGL or otherwise improperly failed to disclose the facts relating to the sale of CIH's key businesses and assets.  Plaintiff and RGL only recently learned that the sale of the CFD and spread betting businesses had become effective on December 19, 2012, and it was not until CIH produced its consolidated financial statements on January 14, 2015, that Plaintiff and RGL discovered that those businesses constituted the principal businesses of CIH itself.

84.    Defendants hid these matters from Plaintiff and RGL or otherwise improperly failed to disclose these matters to Plaintiff and RGL.  Indeed, CIHLLC failed to obtain RGL's consent before the sale of CIL's trading activity to CFE.  CIH failed to provide its audited financial statements to RGL until January 14, 2015.

## CIHLLC'S CONDUCT IS NOT EXCULPATED

85.    The liability of CIHLLC is not exculpated since, *inter alia*, its conduct was the result of active and deliberate dishonesty, and/or was clearly outside the scope of authority granted to CIHLLC under the Partnership Agreement or any other agreement to which CIHLLC was a party in its capacity as general partner of CIH.  Furthermore, upon information and belief, CIHLLC's acts or omissions were not done in reliance upon the opinion of independent legal

counsel or public accountant selected with the exercise of reasonable care by CIHLLC on behalf of CIH.

## COUNT I

### (BREACH OF PARTNERSHIP AGREEMENT AGAINST CIHLP LLC)

86.     Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

87.     Section 1.01 of CIH's Partnership Agreement provides, in pertinent part, that the partnership was formed to "own, operate, develop and invest in businesses which are connected with, or involved in, games, gaming, betting, lotteries, contracts for differences, futures, options and financial and commodity products (the 'Products')" and to "realize the income and gains to be derived from the Products, for the mutual benefit of the Partners."

88.     Section 3.03 of the Partnership Agreement provides, in pertinent part, that "no action will be taken by the General Partner . . . to wind up, dissolve or liquidate the Partnership ... [or to] sell[] all, or substantially all, of the business or assets of the Partnership" without the consent of all partners.

89.     In December 2012, CIHLLC caused CIL to sell off to its affiliate, CFE, its CFD and spread betting businesses which comprised CIL's trading activity and were its most valuable (remaining) assets.  CIL has at all relevant times been CIH's most profitable subsidiary and has accounted for the majority of CIH's revenues for each year since CIL was formed, through fiscal year ended December 31, 2012.  The sale in December 2012 of CIL's CFD and spread betting businesses constitutes a sale of all or substantially all of the business and/or assets of CIH.

90.     CIHLLC failed to provide any notice to RGL of the sale of CIL's trading activity businesses.  In breach of Section 3.03 of the Partnership Agreement, CIHLLC failed to obtain unanimous consent for the sale of CIL's CFD and spread fair businesses to CFE.

91.     Accordingly, the Litigation Trust is entitled to judgment against CIHLLC for breach of contract and damages in an amount to be determined at trial.

## COUNT II

**(AIDING AND ABETTING BREACH OF PARTNERSHIP AGREEMENT AGAINST CANTOR FITZGERALD SECURITIES AND CANTOR FITZGERALD L.P.)**

92.     Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

93.     At all relevant times, CFS was the sole member and decision-maker of defendant CIHLLC, the managing general partner of CIH, and managed CIHLLC's activities.

94.     At all relevant times, CFLP was the sole member of CIHLP II, LLC.

95.     Lutnick executed the Partnership Agreement on behalf of CIHLLC, by CFS, CIHLCC's sole member.  CFS, CIHLLC's sole member and decision maker had knowledge that the Partnership Agreement Section 3.03 required the unanimous consent of RGL in order to sell substantially all of CIH's business or assets.

96.     Lutnick executed the Partnership Agreement on behalf of CIHLP II, whose sole member is CFLP, which also thus had knowledge that the Partnership Agreement Section 3.03 required the unanimous consent of RGL in order to sell substantially all of CIH's business or assets.

97.     Having signed the Partnership Agreement on behalf of CIHLLC and CFLP, Lutnick had knowledge while acting as a director of CIL that the proposed sale of substantially all of CIL's (and thus CIH's) businesses for the benefit of CFLP, as proposed by the transfer of trading activity business out of CIL to CFE, required the consent of RGL under the Partnership Agreement.

98.     In CIL's Directors' Report included in CIL's Annual Report and Financial Statements for year ended December 31, 2010, CIL's Board disclosed that CIL's management had conducted a review to "ensure resources are most efficiently deployed within the [Cantor LP] group," and that the directors had commenced a "project to transfer all trading activity of the Company to [CFE]."  In CIL's Directors' Report included in CIL's Annual Report and Financial Statements for the Year Ended December 31, 2012, CIL stated that "The Board determined in 2012, that to enable the long term development of the CFD and FSB businesses, it would be more beneficial to sell the CFD and FSB businesses to CFE.  The effective date of the sale was 19 December 2012 and CFE acquired the assets and liabilities of the CFD ad FSB businesses at fair value plus goodwill of $1.  On the transfer of the businesses from the Company to CFE, these compensation arrangements ceased."  Selling the businesses leaving CIL – and thus, CIH – without substantially all of their remaining business would not "enable the long term development" for CIL.  Rather, as mentioned in the 2010 financials, the transaction was for the benefit of the Cantor LP group.

99.     At the time of the sale, CIL's CFD and financial spread betting businesses comprised substantially all of CIH's business.  CIHLLC did not obtain the unanimous consent required by Section 3.03 of the Partnership Agreement from all of CIH's partners, including RGL, for the sale of CIL's CFD and financial spread betting businesses, to anyone let alone to CFE, a related party.

100.     Lutnick controls Cantor LP and its subsidiaries, including CIH and CIHLLC, and acted on behalf of CIHLLC and CIHLP II LLC when RGL entered into the Partnership Agreement.  In 2010, Lutnick was Chairman of Cantor LP and of CFS, and a director of CFE and of CIL when the decision was made to sell CIL's trading activity businesses to CFE.  He

owned at least 10% of Cantor LP at the time that CIL's trading activity was transferred to CFE, a transaction designed to benefit Cantor LP and its affiliates.

101.    Merkel was an officer of CFS and a director and/or officer of Cantor LP, a Director and officer of CIHLLC, and director of both CIL and CFE in 2010 when the decision was made to sell CIL's trading activity businesses to CFE, and in 2012 when CIL's trading activity businesses were transferred to CFE.

102.    Barnard is an officer of Cantor LP, and was a director of CIL and of CFE in 2010 when the decision was made to sell CIL's trading activity businesses to CFE.  Other individuals, including R. Mark Snelling and Mark A. Cooper, are employed by Cantor LP who were directors of CIL and CFE in 2010 when the decision was made to sell CIL's trading activity businesses to CFE, and in 2012 when CIL's trading activity businesses were transferred to CFE.

103.    CIHLLC and CFLP's actions in removing substantially all the business of CIH were taken "to ensure resources are most efficiently deployed within the CFLP group," that is for the benefit of the CFLP group overall to the exclusion of RGL, with the knowledge that selling the businesses would necessarily transfer substantially all the CIH businesses without the consent required from RGL by the Partnership Agreement.

104.    General Partner CIHLLC breached a contractual duty imposed by the Partnership Agreement to obtain the unanimous consent of the limited partners (including RGL) to sell substantially all the assets and businesses of CIH.

105.    As the managing member and sole decision maker of CIHLLC, CFS participated knowingly in the contractual breach of the Partnership Agreement by causing CIHLLC to authorize the actions in selling substantially all the remaining businesses in CIH, without obtaining the prior consent of RGL.

106.    CFLP knowingly participated in the breach of the Partnership Agreement by causing its subsidiaries to enter into the transactions of selling the CFD and FSB businesses to CFE, without having the consent of RGL, for the benefit of the CFLP group.

107.    For all the reasons set forth above, CFS and CFLP aided and abetted CIHLLC in its breach of contract as set forth in Count I of this Complaint.

108.    Accordingly, the Litigation Trust is entitled to judgment against CFS and CFLP and damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following:

1)    An order declaring that CIHLLC breached the Partnership Agreement in connection with the sale of CIL's trading activity to CFE on or about December 19, 2012;

2)    An order awarding monetary damages, including rescissory damages, together with pre- and post-judgment interest;

3)    An order declaring that, pursuant to Sections 9.08 and 9.12 of the Partnership Agreement, and Delaware Law, the Litigation Trust is entitled to reasonable attorneys' fees and expenses;

4)    An order awarding Plaintiff its reasonable attorneys' fees pursuant to the Partnership Agreement and Delaware law;

5)    An order awarding Plaintiff its costs and expenses incurred in this proceeding, including experts' and attorneys' fees; and

6)     An order granting such other and further relief as this Court deems just and proper.

Dated: October 16, 2015

                                        **GRANT & EISENHOFER P.A.**


                                        /s/ Geoffrey C. Jarvis
                                        Jay W. Eisenhofer
                                        Geoffrey C. Jarvis
                                        Gordon Z. Novod
                                        Nathan A. Cook
                                        Diane Zilka
                                        485 Lexington Avenue
                                        New York, New York 10017
                                        Tel: (646) 722-8500
                                        Fax: (646) 722-8501

                                        *Counsel to Plaintiff Marc S. Kirschner,*
                                        *Trustee of The Refco Litigation Trust*