UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC#:**
**DATE FILED:** 09/30/2016

---

MARK S. KIRSCHNER, as Trustee of the
REFCO LITIGATION TRUST,

Plaintiff,

v.

CIHLP LLC, CANTOR FITZGERALD L.P.,
and CANTOR FITZGERALD SECURITIES,

Defendants.

No. 15-CV-8189 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

This case arises out of an alleged breach of the January 1, 2002 Amended and Restated Limited Partnership Agreement (the "LPA") of Cantor Index Holdings, L.P. ("CIH" or the "Partnership"). Plaintiff Mark S. Kirschner, as Trustee of the Refco Litigation Trust (the "Litigation Trust") brings two claims, alleging: (1) that CIH's general partner, Defendant CIHLP LLC ("CIHLLC"), breached the LPA by causing or authorizing the sale of substantially all of the Partnership's assets without the approval of Refco Group Ltd., LLC ("RGL"), one of CIH's limited partners; and (2) that Defendants Cantor Fitzgerald L.P. ("Cantor LP") and Cantor Fitzgerald Securities ("CFS") (collectively, "Cantor") aided and abetted CIHLLC's breach and tortiously interfered with the LPA. Defendants move to dismiss Plaintiff's claims. For the reasons that follow, Defendants' motion is granted.

## BACKGROUND

### I.   Procedural History

The Litigation Trust was established by agreement between RGL and other parties pursuant to the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect

1

Subsidiaries (the "Bankruptcy Plan") in the Chapter 11 bankruptcy case *In re Refco Inc.*, No. 05-60006 (RDD) (Bankr. S.D.N.Y.) (the "Bankruptcy Case"). Under the Bankruptcy Plan, certain claims of RGL were contributed to the Litigation Trust, including the claims asserted in this case. *See Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*, No. 13-CV-1654 (RA), 2014 WL 2610608, at \*11 (S.D.N.Y. June 10, 2014). Kirschner, as Trustee of the Litigation Trust, filed this action in the Southern District of New York on October 16, 2015. Because this action relates to the Bankruptcy Case, this Court has jurisdiction under 28 U.S.C. § 1334(b).

## II.     Factual Allegations[1]

In May 2000, Cantor formed CIH, a Delaware limited partnership, as a vehicle for entering the gambling business. *See* Compl. ¶¶ 22, 35. On or around January 1, 2002, following discussions between Cantor LP and Refco Inc., RGL invested $8 million in CIH in exchange for a limited partnership interest. *See id.* ¶¶ 36–37.

Concurrently with RGL's investment, RGL, CIHLLC, and CIHLP II LLC ("CIHLLC II") (collectively, the "Partners") executed the LPA, which set forth the relevant rights, powers, and responsibilities of the CIH Partners. *See id.* ¶ 38. RGL and CIHLLC II were limited partners, and held ten and eighty-nine percent interests in the Partnership, respectively. *Id.* ¶ 22. CIHLLC served as general partner, and held a one percent interest. *Id.* As general partner, CIHLLC possessed "the sole power to make management decisions on behalf of the Partnership," LPA § 3.01, with some limited exceptions. As relevant to the instant motion, Section 3.03 of the LPA provides that CIHLLC cannot take any "action . . . with respect to or within the scope of" certain enumerated "decisions or actions," such as "[s]elling all, or substantially all, of the business or

---

[1] The following facts are taken from the Complaint and the LPA, which is attached to the Complaint as Exhibit A, and may be considered on this motion. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). For purposes of this motion, these facts are assumed to be true.

2

assets of the Partnership," without the unanimous approval of the Partners, including RGL. LPA § 3.03.

CIH had no operations of its own, but reported the financial results of its four wholly-owned subsidiaries—Cantor Index Limited ("CIL"), Cantor Index LLC, Cantor Fitzgerald Game Holdings, LLC, and Hollywood Stock Exchange, LLC—on a consolidated basis. Compl. ¶¶ 3, 22. CIH's key operating subsidiary was CIL, which accounted for nearly 90 percent of the assets and revenue of CIH for each year between 2008 and 2013. *Id.* ¶¶ 3, 5, 45. CIL engaged in a variety of betting-related activities, but for most of its existence, its primary business involved contracts for difference ("CFDs") and financial spread betting—products that provided investors with opportunities to gamble on movements in financial indices. *See id.* ¶¶ 4, 46. CIL grew over time, and derived substantial revenues from its business. According to the Complaint, for the years 2006 and 2007, CIL reported revenue of approximately $76.4 million and $51.0 million, respectively, "net of any related dealing / broking expenses (e.g. commissions cost of carry)." *See id.* ¶ 56 (internal quotation marks omitted).

The Complaint alleges that, between 2008 and 2010, several of CIL's businesses and assets were transferred from CIL to Cantor affiliates in exchange for little or no consideration, leaving CIL with only its CFD and spread betting businesses. *See id.* ¶¶ 57–61. CIL's Annual Reports for 2010 and 2011 stated that CIL's principal activity was "'to provide spread betting services to clients and act as a broker in [CFDs],' and that its 'two main business lines . . . [were] the CFD and spread betting businesses.'" *Id.* ¶ 61 (omission in original). By 2010, given the significance of CIL to CIH's portfolio, CIL's CFD and spread betting operations constituted not only substantially all of CIL's business, but CIH's as well. *See id.* ¶¶ 62–63. For the year 2010, CIL reported revenue of $8,089,000 from its CFD and spread betting businesses, and CIH reported

3

total revenue of $8,388,000. *Id.* ¶ 63. For 2011, CIL reported revenue of $10,334,000 from the two businesses, and CIH reported total revenue of $10,914,000. *Id.* For 2012, the figures were $11,203,000 and $11,278,000. *Id.*

In 2010 or 2011, CIL began making arrangements to transfer its CFD and spread betting businesses as well, stating in its 2010 Annual Report that "[f]ollowing a review conducted by the management of [CIL] to ensure resources are most efficiently deployed within the [Cantor LP] group, the directors have commenced a project to transfer all trading activity of [CIL] to Cantor Fitzgerald Europe [('CFE')]." *Id.* ¶ 66 (first and third alterations in original) (internal quotation marks omitted). Similar language appeared in CIL's 2010 and 2011 Directors' Reports. *See id.* ¶¶ 67–68.[2] According to the Complaint, on or about December 19, 2012, CIHLLC "caused" or "authorize[d]" the sale of CIL's remaining businesses to CFE for the sum of $1 (the "CFE Transaction"). *See id.* ¶¶ 7, 69, 89, 105. In its 2012 Annual Report, CIL disclosed that "CFE [had] acquired the assets and liabilities of the CFD and [financial spread betting] businesses at fair value plus goodwill of $1" and that "[o]n the transfer of the businesses from [CIL] to CFE . . . compensation arrangements [between CIL and CFE] ceased." *Id.* ¶ 69 (fourth and fifth alterations and omission in original) (internal quotation marks omitted). Plaintiff alleges that RGL was not given notice of the CFE Transaction or an opportunity to object. *Id.* ¶¶ 9, 65, 90.

According to the Complaint, the CFE Transaction left CIL and its parent, CIH, with very little. *See id.* ¶ 11. In its 2012 Annual Report, CIL stated that it would "remain active, but not trading, while the Directors consider[ed] the future strategy of the Company" and that CIL's directors had agreed to apply to the U.K. Financial Conduct Authority ("FCA") to deauthorize CIL. *Id.* ¶ 70 (internal quotation marks omitted). CIL was deauthorized by the FCA in June 2013.

---

[2] During this period, CIL and its directors stated on multiple occasions that CIL would retain an economic interest in the transferred activities, but ultimately that did not occur. *See* Compl. ¶¶ 66–70.

*Id.* At the time of CIL's 2013 Annual Report, CIL was not actively trading, and had no intention to resume trading in the future. *See id.* ¶ 71. For the year ended December 31, 2013, CIL reported $0 in revenue, and CIH reported only $33,000. *Id.*

Plaintiff thus alleges that CIHLLC breached the LPA because the CFE Transaction constituted a sale of substantially all of CIH's assets and CIHLLC caused or authorized the sale without obtaining the unanimous approval of the Partners, as required by Section 3.03 of the LPA. Plaintiff further alleges that CFS and Cantor LP aided and abetted CIHLLC's breach or tortiously interfered with the LPA.[3]

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court "need not accord '[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness.'" *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (alteration and omission in original) (quoting *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20, 27 (2d Cir. 1989)).

---

[3] The Complaint also alleges that CFE later sold the CFD and financial spread betting businesses to Solo Capital Partners LLP, a partnership to which "[i]ndividuals running CIL and CFE [had] close, if not controlling business ties," for $4.6 million. *See* Compl. ¶¶ 75–82.

5

## DISCUSSION

### I. Choice of Law

This Court has jurisdiction over this case under 28 U.S.C. § 1334(b). "[B]ankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state." *In re Gaston & Snow*, 243 F.3d 599, 601–02 (2d Cir. 2001). Because Plaintiff's claims arise under state law and do not appear to implicate federal policy concerns, New York choice-of-law rules apply. *See id.* at 607 (affirming application of forum state choice-of-law rules to a breach of contract claim).

The LPA contains a choice-of-law provision, which states that it "shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of Delaware, without giving effect to the principles of conflicts of laws thereof." LPA § 9.12. As the parties to the LPA have chosen Delaware law, the Court will apply Delaware law, at least with respect to Plaintiff's breach of contract claim. *See Refco Grp. Ltd.*, 2014 WL 2610608, at *40 ("New York recognizes the right of contracting parties to agree to the choice of law." (internal quotation marks omitted) (quoting *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 425 (S.D.N.Y. 2006))).

The parties appear to disagree as to whether New York or Delaware law governs Plaintiff's second cause of action, which Plaintiff characterizes alternatively as a claim for aiding and abetting breach of contract, *see* Compl. ¶¶ 92–108, and as one for tortious interference with contract, *see* Pl.'s Opp. Mem. 14–17. As explained below, the Court need not reach this question, because Plaintiff's second cause of action cannot survive under either state's law. *See Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (observing, in the context of

6

a choice-of-law analysis, that "a court need not decide issues whose resolution it has determined can have no possible effect on the ultimate disposition of the case.").

## II. Breach of Contract

Plaintiff alleges that CIHLLC breached Section 3.03 of the LPA by failing to obtain RGL's approval for the CFE Transaction. *See* Compl. ¶¶ 86–91. Under Delaware law, to state a claim for breach of contract, "the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Defendants argue that Plaintiff has failed to allege a breach of the LPA, in part because Plaintiff has not plausibly alleged that CIHLLC took any action in connection with the CFE Transaction. *See* Defs.' Mem. 7–9.[4] The Court agrees.

The Complaint fails to plead any facts demonstrating that CIHLLC breached Section 3.03, which is triggered only by "actions" of CIHLLC. Plaintiff contends that the allegation that CIHLLC "caused" CIL to undertake the CFE Transaction, standing alone, is enough to survive a motion to dismiss. *See* Pl.'s Opp. Mem. 8–10. But this, like Plaintiff's assertion that CIHLLC "authorize[d]" the CFE Transaction, Compl. ¶ 105, is a conclusory allegation that the Court cannot credit in the absence of supporting facts. *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." (second alteration in original) (internal quotation marks omitted) (quoting *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d. Cir.

---

[4] Defendants also contend that Plaintiff's allegations fail to establish that the CFE Transaction constituted a sale of "substantially all" of CIH's assets. *See* Defs.' Mem. 9–10. As the Court finds that Plaintiff has not plausibly alleged that CIHLLC took any action in connection with the CFE Transaction, it need not address this argument.

2002))); *see also Iqbal*, 556 U.S. at 678–79 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

As the Complaint makes clear, it was CIL that sold its assets to CFE, and CIL's management and directors made the decision to do so. *See* Compl. ¶¶ 66–69. In light of the fact that CIL was a wholly-owned subsidiary of CIH, it is conceivable that CIHLLC, as CIH's general partner, may have had some role in the CFE Transaction, but the Complaint offers nothing in the way of "well-pleaded facts" to support this assertion. *See Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))). Without more, Plaintiff fails to "nudge[ ] [his] claim[ ] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The Second Circuit's decision in *De Jesus v. Sears, Roebuck & Co., Inc.* is instructive here, as it demonstrates that allegations of ownership alone are not enough to establish a parent's involvement in activities of a subsidiary. 87 F.3d 65 (2d Cir. 1996). In *De Jesus*, insurance agents brought a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), alleging that Sears, Roebuck & Co., Inc. ("Sears") had maintained its subsidiary, Allstate Insurance Company ("Allstate"), as a "criminal enterprise" that wrongfully induced agents into entering Allstate's Neighborhood Office Agent program. *See id.* at 67–68 (internal quotation marks omitted). While the alleged enterprise was carried out by Allstate, plaintiffs claimed that "'Sears operated and managed the [RICO] enterprise through corporate control[,]' and that '[i]n this fashion, Sears determine[d] the business objectives and goals of Allstate, and designate[d] those persons who manage[d] and operate[d] Allstate in accordance with [the fraudulent RICO] objectives and goals.'" *Id.* at 69 (alterations in original).

8

The Second Circuit held that these allegations were insufficient to overcome the presumption of separateness between Sears and Allstate. *See id.* at 70; *cf. Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 769 (Del. Ch. 2009) ("Delaware law respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating potential of corporate and other limited liability entities would be stymied if it did otherwise."), *aff'd*, 976 A.2d 170 (Del. 2009) (Table). Similar to Plaintiff's allegations in this case that CIHLLC "caused" or "authorize[d]" the CFE Transaction, *see* Compl. ¶¶ 7, 69, 89, 105, the plaintiffs in *De Jesus* asserted that "the fraudulent actions taken by Allstate employees were 'caused by, known to and ratified by Sears.'" 87 F.3d at 70. The Second Circuit nevertheless dismissed the plaintiffs' claim because "the pleadings [were] devoid of *any* specific facts or circumstances supporting this assertion." *Id.* So too here, as Plaintiff has not alleged any facts supporting his assertion that CIHLLC "caused" or "authorize[d]" the CFE Transaction—apart from the fact that CIH owned CIL—dismissal is warranted.

## III.   Aiding and Abetting Breach of Contract

Plaintiff's second cause of action must also be dismissed. The Complaint alleges that Cantor LP and CFS aided and abetted CIHLLC's breach of the LPA, *see* Compl. ¶¶ 92–108, but aiding and abetting breach of contract is not a valid cause of action under New York or Delaware law. *See Amtrust N. Am., Inc. v. Safebuilt Ins. Servs., Inc.*, No. 14-CV-9494 (CM), 2015 WL 7769688, at *9 (S.D.N.Y. Dec. 1, 2015) ("New York law . . . affords no cause of action for aiding and abetting breach of contract[.]"), *reconsideration denied*, 2015 WL 9480080 (S.D.N.Y. Dec. 22, 2015); *Brinckerhoff v. Enbridge Energy Co., Inc.*, No. 11314-VCS, 2016 WL 1757283, at *19 (Del. Ch. Apr. 29, 2016) ("[A]s a matter of law, Delaware does not recognize a claim for aiding and abetting a breach of contract.").

9

*Feeley v. NHAOCG, LLC*, 62 A.3d 649 (Del. Ch. 2012), which Plaintiff cites in an attempt

to save his claim, does not say otherwise. In *Feeley*, the Delaware Chancery Court declined to

dismiss a claim for aiding and abetting a breach of contractually created *fiduciary duties*. 62 A.3d

at 658–59. In so doing, the court relied on the Delaware Supreme Court's decision in *Gotham*

*Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160 (Del. 2002), which recognized

that an aiding and abetting theory was available, in certain circumstances, with respect to breaches

of contractual provisions "that supplant[ ] traditional fiduciary duties." *See Feeley*, 62 A.3d at 659

(internal quotation marks omitted) (quoting *Gotham Partners*, 817 A.2d at 173). Plaintiff has not

stated a *Gotham Partners* claim here, however, because Plaintiff does not contend that Section

3.03 of the LPA, the provision that CIHLLC is alleged to have breached, "supplant[ed] traditional

fiduciary duties." *Gotham Partners*, 817 A.2d at 173. Moreover, for the reasons stated above,

Plaintiff has not even plausibly alleged a breach of Section 3.03.

**IV.    Tortious Interference with Contract**

Lastly, Plaintiff contends that the Complaint also states a claim for tortious interference

with contract. *See* Pl.'s Opp. Mem. 14–17. But like Plaintiff's purported claim for aiding and

abetting breach of contract, a tortious interference with contract claim cannot survive where there

is no properly alleged claim for an underlying breach. *See Robins v. Max Mara, U.S.A., Inc.*, 923

F. Supp. 460, 468 (S.D.N.Y. 1996) ("In order for the plaintiff to have a cause of action for tortious

interference of contract, it is axiomatic that there must be a breach of that contract by the other

party." (internal quotation marks omitted) (quoting *Jack L. Inselman & Co., Inc. v. FNB Fin. Co.*,

364 N.E.2d 1119, 1120 (N.Y. 1977))); *Brinckerhoff*, 2016 WL 1757283, at *19 ("[A plaintiff]

cannot state a claim for aiding and abetting a breach or tortious interference with contract when he

has failed to state a claim for an underlying breach of the LPA."). Thus, because the Complaint

does not state a claim for breach of contract, Plaintiff has also failed to allege tortious interference with contract.

## CONCLUSION

Defendants' motion to dismiss is granted.  Plaintiff may seek leave to file an amended complaint by letter motion no later than October 28, 2016.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 15.

SO ORDERED.

Dated:     September 30, 2016
           New York, New York

Ronnie Abrams
United States District Judge

11